Filed 5/20/13  P. v. Castrejon CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B239024 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA090313) |
| v. | |
| JOSE A. CASTREJON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Jenifer Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

Jose A. Castrejon appeals from the judgment entered following his conviction by jury on one count of second degree robbery in violation of Penal

Code section 211.[1]  He contends that the trial court erred in allowing the prosecution to impeach him with a prior conviction and in excluding a photograph he sought to introduce.  He also contends that the trial court abused its discretion in denying his motion for a new trial.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

On April 7, 2010, J.P., who was eight years old at the time, went to the store with her uncle, Miguel Frausto (Miguel) to buy a collar for her aunt's dog.  J.P. held the dog on a leash outside the store while her uncle went inside.  While J.P. was standing outside the store, a man came up to her, grabbed the dog, and ran to his truck.  J.P. yelled for her uncle and tried to hold onto the leash, but the man drove away with the dog.  Miguel ran out of the store and saw a truck that he knew belonged to appellant drive away.  He testified that he did not see appellant in the truck, but he recognized the truck as appellant's.  Miguel knew appellant because his sister, Stephanie Frausto (Stephanie), used to date appellant's cousin.

Stephanie obtained the surveillance video from the store, and it was played at trial.  The video shows a man in a white T-shirt taking the dog from J.P., and Miguel running out of the store.

Miguel contacted the police the day after the incident.  After notifying the police, Miguel and his brother George went to appellant's house to get the dog.  Appellant's cousin gave them the dog.  When Stephanie got the dog back, she noticed that someone had tried to cover a scar on the top of the dog's head with a marker or paint.

---

[1]  All further statutory references are to the Penal Code unless otherwise specified.

The day after retrieving the dog, Miguel and George met appellant and some of appellant's friends at a park to discuss the incident. Miguel testified that they settled the matter.

Miguel told Los Angeles County Sheriff's Department Detective Glen Eads that he saw appellant get into the truck with the dog, and he identified appellant in a photographic lineup. However, at trial Miguel denied seeing appellant with the dog and testified that he did not remember identifying appellant to Detective Eads.

Detective Eads and his partner went to appellant's house, where they saw appellant sitting on a motorcycle in the street. When they approached appellant, appellant said, "Is this about the . . . stupid dog that got stolen?" Appellant told them that he had spoken to the family members about the incident, and it "was taken care of." Appellant also said, "Don't you guys have anything better to do than harass me for stealing a dog? There's people out there being shot and killed." At trial, appellant denied making these statements. Detective Eads searched appellant's truck and found a white T-shirt and some dog food.

*Defense Evidence*

Appellant's cousin, Ezequiel Marin, lived with appellant. Marin knew Miguel and George because he had dated Stephanie for six months in 2008.

In April 2010, Marin saw Miguel and George outside his house, looking at appellant's truck. Miguel and George started yelling at Marin about a puppy, saying that Marin and appellant "did it." Marin did not know what they were talking about, but he had seen a dog in the house that morning, so he went into the house, got the dog, and gave it to Miguel and George.

Appellant testified that the man in the white T-shirt seen on the surveillance video taking the dog was not him, but a man named Morro. He stated that he had

let Morro borrow his truck that day, even though he did not know Morro well. When Morro returned the truck about 15 minutes later, he told appellant he had found the dog running down the street. Appellant bought the dog from Morro for $50 and put it in his house.

Appellant testified that Miguel called him and took him to J.P.'s house, where he discussed the incident with Miguel, J.P., and J.P.'s mother, grandmother, and aunt. Appellant told J.P.'s family that he had loaned his truck to Morro and wanted to help them find Morro.

Appellant did not know where Morro lived. He searched for Morro in the neighborhood for about a day and a half but did not find him.

Appellant told Detective Eads that Morro had taken the dog. Detective Eads asked appellant for contact information for Morro, but appellant did not have any. Appellant told Detective Eads that Morro was about his own height and weight.

*Rebuttal Evidence*

Appellant told Detective Eads that he knew Morro had stolen the dog, but appellant wanted to make money by buying it for $50 and reselling it for $150. After Detective Eads told appellant that the family denied meeting with him, appellant changed his story to say that he had only met with Miguel.

*Procedural Background*

Appellant was charged by information with one count of second degree robbery (§ 211). The information further alleged that the victim of the offense was under 14 years old pursuant to section 667.9, subdivision (a).

The jury found appellant guilty and found the allegation to be true. The court sentenced appellant to the upper term of five years, plus one year pursuant to

4

section 667.9, subdivision (a), for a total term of six years.  Appellant filed a timely notice of appeal.

## DISCUSSION

Appellant challenges his conviction on three grounds.  First, he contends that the trial court erred in permitting the prosecution to impeach him with a prior conviction for carrying a concealed weapon because the offense did not involve moral turpitude.  Second, he contends that the trial court abused its discretion in excluding the photograph of Morro.  Finally, appellant contends that the court abused its discretion in denying his motion for a new trial because he was denied the effective assistance of counsel.

I.      *Impeachment with Prior Conviction*

The trial court permitted the prosecutor to impeach appellant with a felony conviction for possession of a concealed firearm under former section 12025, subdivision (a)(1).[2]  On appeal, appellant contends that possession of a concealed firearm is not a crime of moral turpitude, and that therefore the court erred.  We disagree.

In *People v. Robinson* (2005) 37 Cal.4th 592 (*Robinson*), the California Supreme Court noted that the prosecution witnesses' misdemeanor convictions for possession of a concealed handgun "reflected a crime of moral turpitude and therefore were relevant to the witnesses' honesty and veracity."  (*Id.* at p. 626.) Similarly, in *People v. Gabriel* (2012) 206 Cal.App.4th 450 (*Gabriel*), the appellate court held that the trial court properly permitted the prosecution to

---

[2]      The provision regarding carrying a concealed weapon is now found in section 25400.

5

impeach the defendant with evidence of his prior conviction for possession of an assault weapon in violation of section 12280, subdivision (b). (*Gabriel*, *supra*, 206 Cal.App.4th at p. 458.) The court relied on *People v. Garrett* (1987) 195 Cal.App.3d 795, which held that the possession of an unregistered firearm was a crime of moral turpitude, and reasoned that "[t]he mere possession of such weapons indicates a readiness to do evil. [Citations.]" (*Gabriel*, *supra*, 206 Cal.App.4th at p. 457.)

In light of these decisions, we conclude that felony possession of a concealed firearm suggests a readiness to do evil, and that therefore the crime is one of moral turpitude. In any event, even if appellant's conviction did not involve moral turpitude, we would find no prejudice. The evidence of appellant's guilt was strong. His truck was used in the crime. Miguel told Detective Eads that he saw appellant get into the truck with the dog (though at trial Miguel denied this and testified that the matter had been settled with appellant). The day after the robbery, the dog was at appellant's house, where it was returned to Miguel and his cousin. Detective Eads testified that appellant essentially admitted stealing the dog when he saw Detective Eads approaching him at appellant's house. Appellant's defense was that the true robber was someone named Morro, to whom he had loaned his truck. But he did not know Morro well and had no contact information for him. In light of the evidence that was presented, it is not reasonably probable that if the trial court had not allowed appellant to be impeached with his conviction for possession of a concealed firearm, a result more favorable to appellant would have occurred. (*People v. Castro* (1985) 38 Cal.3d 301, 319.)

6

II.     *Exclusion of Facebook Photo*

Defense counsel sought to introduce a photograph printed from Facebook that allegedly was a picture of Morro. To lay the foundation, Marin testified that, during the trial, he was on Facebook and saw a picture of a girl he knew in a picture with Morro. Marin was friends with the girl on Facebook, but he did not know her name, and he did not know when or where the picture of the girl and Morro was taken. Appellant testified that Morro was the person in the picture, but he did not know the girl in the picture and was not present when the picture was taken.

After hearing Marin's and appellant's testimony, the court expressed concern that the prosecution did not have the opportunity to do any independent investigation about the identity of the person in the photograph. The court also found Marin's testimony not credible and so concluded that the foundation was not properly laid regarding the source of the photograph. The court therefore excluded the photograph.

"A trial court's decision to admit or exclude evidence is a matter committed to its discretion '"and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 585, overruled on another point in *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305.)

"A photograph is a 'writing' and '[a]uthentication of a writing is required before it may be received in evidence.' (Evid. Code, §§ 250, 1401, subd. (a).) [¶] A photograph or other writing may be authenticated by 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' (Evid. Code, § 1400) . . . ." (*People v. Beckley* (2010)

7

185 Cal.App.4th 509, 514 (*Beckley*).) *Beckley* described two ways to authenticate a photograph. First, "'the testimony of a person who was present at the time a film was made that it accurately depicts what it purports to show is a legally sufficient foundation for its admission into evidence.' [Citation.]" (*Id.* at p. 515.) Second, "authentication of a photograph 'may be provided by the aid of expert testimony, . . . although there is no one qualified to authenticate it from personal observation.' [Citation.]" (*Ibid.*)

In *Beckley*, the court held that the prosecution failed to authenticate a photograph taken from a defendant's girlfriend's MySpace page, even though the defendants conceded the face in the photograph was the girlfriend's face. (*Beckley*, *supra*, 185 Cal.App.4th at p. 515.) The detective who downloaded the photograph "could not testify from his personal knowledge that the photograph truthfully portrayed [the girlfriend] flashing the gang sign and . . . no expert testified that the picture was not a "'composite" or "faked'" photograph." (*Ibid.*) The court reasoned that digital photographs could easily "be changed to produce false images" in concluding that the photograph was not sufficiently authenticated, although the court further held that the admission of the photograph was not prejudicial because of the strong evidence of guilt. (*Id.* at p. 515.)

*Beckley* also held that the prosecution insufficiently authenticated a purported gang member roster that the detective printed from the internet. (*Beckley*, *supra*, 185 Cal.App.4th at pp. 517-518.) Although the printout presumably was "an accurate representation of the Web page [the detective] found on the Internet," the court stated that the evidence was insufficient to show that the writing was what it purported to be – a roster of the gang's members. (*Id.* at p. 517.)

8

By contrast, in *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434 (*Valdez*), the court held that the prosecution did sufficiently authenticate printouts from the defendant's MySpace page. In *Valdez*, the investigator from the district attorney's office had printed out the photos a year before the offense at issue. The defendant did not dispute that his own picture was the MySpace page icon identifying the owner of the page, and there were greetings addressed to him by name from other MySpace users, including one from his sister, calling him "big brother." The page owner's stated interests matched what the police otherwise knew about him, and the posts by friends and the page owner included personal details consistent with the defendant. Because "a reasonable trier of fact could conclude from the posting of personal photographs, communications, and other details that the MySpace page belonged to [the defendant]," the court held that "the trial court did not err in admitting the page for the jury to determine whether he authored it." (*Id.* at p. 1435.) The court also pointed out that the defendant did not dispute he was the person in a photograph forming a gang signal, the page was password protected for posting content, and that the detective downloaded the page long before the crimes at issue. (*Id.* at p. 1436.)

Unlike *Valdez*, in which there were a number of factors indicating the authenticity of the photograph and writings on the page, there was no evidence here to sustain a finding that the photograph was what appellant claimed it was – a picture of Morro. Similar to *Beckley*, there was no one who could testify from personal knowledge that the photograph truthfully portrayed Morro. (*Beckley*, *supra*, 185 Cal.App.4th at p. 515.) Neither Marin nor appellant had any personal knowledge about who took the photo, and they did not know the name of the girl who had posted it. The trial court did not err in excluding the photograph.

9

Even if there was error, "'"'[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense."'" [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1243.) "'It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citation.] "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." [Citations.]' [Citation.]" (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1018.) Because of the strong evidence of appellant's guilt, even if the purported photograph of Morro had been admitted, it is not reasonably probable that a result more favorable to appellant would have been reached.

III. *Motion for New Trial*

Appellant contends that the trial court abused its discretion in denying his motion for a new trial, which was based on defense counsel's assertion that she failed to call two witnesses critical to appellant's defense. We find no abuse of discretion.

One of the issues during the trial was whether J.P. was accompanied to the store by Miguel or George. Marin testified that while he was dating Stephanie, George always had hair and a mustache, and Miguel was always bald and clean-shaven, but Marin had not seen them since he and Stephanie broke up in 2008. Marin testified that it was George, not Miguel, in the surveillance video.

A defense investigator, Edward Acosta, testified that when he interviewed J.P. about the robbery, she told him George had taken her to the store that day.

10

Acosta and appellant went to the home to speak with George, but while Acosta was speaking to J.P. about George, J.P.'s mother interrupted and said that it was Miguel who took J.P. to the store.

At appellant's sentencing hearing, defense counsel made an oral motion for a new trial, on the basis that she had failed to call two deputies whose reports indicated that it was George, not Miguel, who took J.P. to the store and witnessed the incident. She argued that, had she called them as witnesses, they would have established that Miguel committed perjury when he testified about the incident. The court denied the motion, reasoning that, whether it was George or Miguel who accompanied J.P. to the store, the fact remained that the dog was taken from J.P. The court stated that, although "issues of credibility are fodder for argument," it was irrelevant whether George or Miguel was the percipient witness to the incident. The court thus concluded that appellant was not denied a fair trial.

"'"'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] "'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.'"' [Citation.]" (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

"Penal Code section 1181 enumerates nine grounds for ordering a new trial. It is true the section expressly limits the grant of a new trial to only the listed grounds, and ineffective assistance is not among them. Nevertheless, the statute should not be read to limit the constitutional duty of trial courts to ensure that defendants be accorded due process of law. 'Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.' [Citations.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.)

"There are two components to an ineffective assistance of counsel claim: deficient performance of counsel and prejudice to the petitioner. *Strickland v. Washington* (1984) 466 U.S. 668, 697, informs us that 'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020 (*Cox*).) To establish prejudice, a defendant must show that, "'but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome.' [Citation.]" (*Id.* at p. 1016.)

Appellant contends that he was prejudiced by trial counsel's failure to call the two deputies because they would have called Miguel's credibility into question, and Miguel was the only witness who identified appellant as the perpetrator. He argues that the case against him was weak, so calling the two deputies would have resulted in a more favorable outcome for him. We disagree.

The case against appellant was not weak, and Miguel's credibility was not crucial. The video, on which both Miguel and appellant were seen, was presented into evidence. More importantly, there was no question that the dog was at appellant's house. The only question was whether the jury believed appellant's story that Morro, not he, had taken the dog. In addition, Detective Eads' testimony that appellant essentially admitted stealing the dog when he saw the detective was compelling evidence of appellant's guilt. There is not "'a reasonable probability

that a more favorable outcome would have resulted had the evidence been presented, i.e., a probability sufficient to undermine confidence in the outcome. [Citations.]'"  (*Cox*, *supra*, 30 Cal.4th at p. 1016.)

Because we conclude that appellant was not prejudiced by trial counsel's failure to call the two deputies, we further conclude that the trial court did not abuse its discretion in denying appellant's new trial motion.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


SUZUKAWA, J.

13